**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re *Ex Parte* Application of Daniel Lavecky and Sunil Sharma for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Documents for Use in Foreign Proceedings.

Case No. ___17-mc-188___

**MEMORANDUM OF LAW IN SUPPORT OF EX PARTE APPLICATION**
**OF DANIEL LAVECKY AND SUNIL SHARMA FOR AN ORDER**
**PURSUANT TO 28 U.S.C. § 1782 GRANTING LEAVE**
**TO OBTAIN DOCUMENTS FOR USE IN FOREIGN PROCEEDINGS**

HUNG G. TA, ESQ. PLLC
Hung G. Ta, Esq.
JooYun Kim, Esq.
Natalia D. Williams, Esq.
250 Park Avenue, 7th Floor
New York, New York 10177
Tel:  (646) 453-7288
Email: hta@hgtlaw.com
*Attorneys for Petitioners Daniel Lavecky and Sunil Sharma*

## TABLE OF CONTENTS

**Page No.**

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT .......................................................................... 1

STATEMENT OF FACTS ................................................................................... 2

I.      THE PARTIES........................................................................................... 2

        A.      Petitioners ....................................................................................... 2

        B.      Respondent...................................................................................... 3

II.     PURE COMMERCE AND THE VISA PAYMENT CARD NETWORK ....................... 3

        A.      The Visa Payment Card Network ................................................... 3

        B.      Cross-border Transactions And Currency Conversion Services ............ 4

        C.      Visa's Anti-Competitive Conduct................................................... 5

        D.      Visa's Prohibition Thwarted Petitioners' Prospective Sale Of Their Shares In Pure Commerce ................................................... 6

        E.      The Prohibition Negatively Impacted Pure Commerce's Business...................... 8

III.    AUSTRALIAN   COMPETITION   AND   CONSUMER   COMMISSSION PROCEEDINGS ........................................................................................ 9

IV.     PETITIONERS' AUSTRALIAN ACTION .................................................. 9

V.      THE LIMITED SCOPE OF THE DOCUMENTS SOUGHT ......................................... 11

LEGAL ARGUMENT.......................................................................................... 12

I.      PETITIONERS HAVE SATISFIED THE STATUTORY FACTORS UNDER SECTION 1782 FOR ISSUANCE OF THE SUBPOENA ................................. 12

II.     THE DISCRETIONARY SECTION 1782 FACTORS WEIGH HEAVILY IN FAVOR OF GRANTING PETITIONERS' APPLICATION FOR ISSUANCE OF THE SUBPOENA........................................................................................ 13

        A.      The Evidence Petitioners Seek Is Likely Unobtainable Without This Court's Assistance ................................................................. 14

        B.      Australian Courts Are Receptive To Assistance From U.S. Courts .................... 16

i

C.    Petitioners' Application Is Not A Bad-Faith Attempt To Circumvent Australian Proof-Gathering Restrictions.............................................................. 18

D.    Petitioners' Narrow, Targeted Requests Are Not Unduly Intrusive Or Burdensome ........................................................................................................... 18

CONCLUSION.......................................................................................................................... 19

# TABLE OF AUTHORITIES

Page No(s).

CASES

*Brandi-Dohrn v. IKB Deutsche Industriebank AG,*
  673 F.3d 76 (2d Cir. 2012) ............................................................. 13, 14

*Euromepa, S.A. v. R. Esmerian, Inc.*,
  51 F.3d 1095 (2d Cir. 1995) ....................................................... 16, 17, 18

*In re Application of Esses*,
  101 F.3d 873 (2d Cir. 1996) .............................................................. 12

*In re Application Pursuant to § 1782*,
  289 F.R.D. 96 (S.D.N.Y. 2008) .......................................................... 18

*In re Chevron Corp.*,
  709 F. Supp. 2d 283 (S.D.N.Y. 2010) .................................................. 14

*In re Ching Chung Taoist Assoc. of H.K.*,
  No. 16-mc-80157-LB,  2016 U.S. Dist. LEXIS 131686 (N.D. Cal. Sep. 23, 2016) ............... 16

*In re Futurecorp Int'l Pty Ltd.*,
  No. C12-80267, 2012 U.S. Dist. LEXIS 164400 (N.D. Cal. Nov. 15, 2012).......................... 17

*In re Gemeinshcaftspraxis Dr. Med. Schottdorf*,
  No. Civ. M19-88, 2006 U.S. Dist. LEXIS 94161 (S.D.N.Y. Dec. 29, 2006).................... 16, 18

*In re Grupo Qumma, S.A. de C.V.*,
  No. M 8-85, 2005 U.S. Dist. LEXIS 6898 (S.D.N.Y. Apr. 22, 2005)..................................... 12

*In re Imanagement Servs., Ltd.*,
  No. Misc. 05-89, 2005 U.S. Dist. LEXIS 17025 (E.D.N.Y. Aug. 16, 2005) .......................... 16

*In re Kreke Immobilien KG*,
  No. 13 Misc. 110, 2013 U.S. Dist. LEXIS 160283 (S.D.N.Y. Nov. 8, 2013) ........................ 13

*In re Malev Hungarian Airlines*,
  964 F.2d 97 (2d Cir. 1992) ............................................................... 14

*In re Metallgesellschaft AG*,
  121 F.3d 77, 79 (2d Cir. 1997) ........................................................... 14

*In re Servicio Pan Americano de Proteccion*,
  354 F. Supp. 2d 269 (S.D.N.Y. 2004) .................................................... 16

iii

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004) ................................................................................ passim

*Kulzer v. Esschem, Inc.*,
    390 F. App'x 88 (3d Cir. 2010) ............................................................... 14

*Lancaster Factoring Co. v. Mangone*,
    90 F.3d 38 (2d Cir. 1996) ........................................................................ 13

*Marubeni Am. Corp. v. LBA Y.K.*,
    335 F. App'x 95, 98 (2d Cir. 2009) ........................................................ 14

*Minatec Fin. S.A.R.L. v. SI Group Inc.*,
    No. 08-cv-269, 2008 U.S. Dist. LEXIS 63802 (N.D.N.Y. Aug. 18, 2008) ...................... 14, 18

*Noel v. The Bank of New York Mellon*,
    No. 11 Mc. 216, 2011 U.S. Dist. LEXIS 84106 (S.D.N.Y. Jul. 27, 2011) .............................. 19

### STATUTES

28 U.S.C. § 1782 ..................................................................................................... 12

Petitioners Daniel Lavecky and Sunil Sharma respectfully submit this memorandum of law in support of their application for an order pursuant to 28 U.S.C. § 1782 ("Section 1782") authorizing Petitioners to obtain documents in this District for use in a civil action brought by Petitioners against Visa Inc., Visa Worldwide Pte Ltd., Visa AP (Australia) Pty Ltd., Visa U.S.A. Inc. and Visa International Service Association (collectively, "Visa Defendants") in the Federal Court of Australia (the "Australian Action").

## PRELIMINARY STATEMENT

Petitioners are the former founders, directors and shareholders of Pure Commerce Pty Ltd. ("Pure Commerce").  At all relevant times, Pure Commerce provided currency conversion services to participants in international payment card networks, including the payment card network ("Visa Payment Card Network") operated by Visa Inc. and its related entities ("Visa").

Starting in 2010, various regulators around the world commenced investigations into certain anti-competitive conduct by Visa, in which Visa sought to restrict the ability of companies such as Pure Commerce to provide currency conversion services to participants in the Visa Payment Card Network.  In 2013, the Australian Competition Consumer Commission commenced a lawsuit against Visa.  The lawsuit resulted in a settlement in which Visa Worldwide Pte Ltd. ("Visa Worldwide") admitted that its conduct violated the Australian Competition and Consumer Act, and was required to pay a monetary penalty of AUD18 million imposed by the Federal Court of Australia.

In April 2016, Petitioners commenced the Australian Action against the Visa Defendants, including Visa Worldwide.  In that action, Petitioners claim that, at the time of the Visa Defendants' anticompetitive conduct in 2010, they were in advanced negotiations to sell their shares of Pure Commerce to at least two highly-interested parties.  As a result of the Visa Defendants' unlawful conduct, the proposed sale was derailed, and it was not until January 2013

1

that Petitioners were finally able to sell their interests in Pure Commerce.  Petitioners claim that, as a result of the Visa Defendants' anticompetitive conduct, Petitioners lost the opportunity in 2010 to sell their shares of Pure Commerce at the same or higher price than that which they received in January 2013.

Atos Origin SA, now known as Atos SE ("Atos") was one of the two parties interested in purchasing Pure Commerce in 2010.  By April 2010, Atos had conducted substantial due diligence of the Pure Commerce business and had expressed an interest in purchasing Pure Commerce.

Petitioners seek permission to obtain documents from Atos, which is located in this District.   Specifically, Petitioners seek documents relevant to the prospective sale of Pure Commerce in 2010 and the adverse impact of the Visa Defendants' anti-competitive conduct on the sale.  These documents are likely to be highly relevant to Petitioners' claims against the Visa Defendants in the Australian Action.

## STATEMENT OF FACTS

### I.    THE PARTIES

#### A.    Petitioners

Petitioner Daniel Lavecky founded Pure Commerce in 1997.  Mr. Lavecky was a director and shareholder of Pure Commerce from May 1998 to April 2015.  *See* Declaration of Jonathan Milner, dated June 6, 2017 ("Milner Decl.") ¶ 3.

Petitioner Sunil Sharma was a director and shareholder of Pure Commerce between January 2008 and January 2013.  Milner Decl. ¶ 4.

During the period between April and October 2010, Mr. Lavecky held approximately 75% of the equity of Pure Commerce; Mr. Sharma held approximately 17%; and Cibalis Pty Limited held the remaining 8%.  Milner Decl. ¶ 5.

2

### B.     Respondent

Respondent Atos SE is a European company registered in accordance with the corporate law of the European Union, and has a main office location at 2500 Westchester Avenue Suite 300, Purchase, New York 10577.  *See* Declaration of Hung G. Ta, dated June 6, 2017 ("Ta Decl.") ¶ 2.

## II.     PURE COMMERCE AND THE VISA PAYMENT CARD NETWORK

### A.     The Visa Payment Card Network

Visa and its related entities operate the Visa Payment Card Network as a single global business.  The Visa Payment Card Network is the largest retail electronic payment network for financial institutions throughout the world.  The Visa Payment Card Network comprises a number of participants, including:

> (1) the network supplier (Visa);
>
> (2) the financial institutions which issue payment cards to cardholders and contract with the cardholders as to the terms and conditions of use of the payment card ("Issuers");
>
> (3) the cardholders who use payment cards to purchase goods or services, or to obtain cash to purchase goods or services ("Cardholders");
>
> (4) the merchants who accept payment cards in exchange for goods or services ("Merchants"); and
>
> (5) the financial institutions that contract with Merchants or ATM operators to enable Merchants or ATMs to accept payment card transactions from Issuers who are members of the Visa Payment Card Network and to secure payment from those Issuers ("Acquirers").

Milner Decl. ¶ 8.  The Visa Payment Card Network operates as a clearing house to facilitate the authorization, clearing and settlement of transactions between Issuers and Acquirers throughout the world.  Milner Decl. ¶ 10.

The Visa Payment Card Network is regulated by the Visa International Operating Regulations ("VIOR").  Through contractual arrangements between particular Visa entities and

Issuers and Acquirers, which include agreeing to be bound by the VIOR, Visa is able to control access to the Visa Payment Card Network.  Milner Decl. ¶ 11.

### B.   Cross-border Transactions And Currency Conversion Services

Cross-border payment card transactions take place when the currency in which the Cardholder wishes to pay differs from the currency in which the Merchant wants to be paid.  Milner Decl. ¶ 12.  When a Visa payment card is used for a cross-border transaction, there are four currencies to be considered:

> (1) the Cardholder currency;

> (2) the currency in which the Issuer settles with Visa;

> (3) the currency in which the Acquirer settles with Visa; and

> (4) the currency in which the Merchant receives payment from the Acquirer.

Milner Decl. ¶ 13.

Visa provides currency conversion services as part of the operation of the Visa Payment Card Network and charges fees to Issuers and Acquirers for the use of those services.  Milner Decl. ¶ 14.

At all relevant times, Pure Commerce provided "dynamic currency conversion" ("DCC") services in several countries, including Australia, the United States, New Zealand, Switzerland, Hong Kong, Singapore and Korea.  Milner Decl. ¶ 6.  DCC providers enable the Acquirer to convert a cross-border transaction into the currency in which the payment card was issued (converted transaction) at the point of sale, prior to the converted transaction being submitted to the international electronic payment card network.  Milner Decl. ¶ 15.

In a DCC transaction, the DCC provider imposes a margin, which is usually shared with the Merchant and the Acquirer.  Milner Decl. ¶ 16.  However, if a Merchant whose transactions are acquired by a financial institution wishes to offer DCC services to a consumer who has a Visa

4

payment card, the Merchant can do so only if Visa permits DCC services to be offered by the Acquirer in accordance with the terms of the VIOR.  Milner Decl. ¶ 18.  If the Acquirer offers DCC services, and a cardholder elects at the point of sale to use those services, there is no need for Visa to provide currency conversion services, at least where the Acquirer settles with Visa in the transaction currency.  Milner Decl. ¶ 17.

Visa thus directly competed in the market for currency conversion services with the suppliers of DCC services, including Pure Commerce.  Milner Decl. ¶ 17.

### C.    Visa's Anti-Competitive Conduct

Prior to May 1, 2010, the rules in the VIOR relating to DCC services within the Asia Pacific region and North America included that:

(1)  Acquirers wishing to offer DCC services were required to register themselves, their Merchant outlets and their DCC supplier with Visa prior to offering such services;

(2)  Acquirers were required to pay an annual registration and monitoring fee of US$20,000;

(3)  Acquirers were not permitted to offer or perform DCC services as a default, and were to ensure that Merchants and DCC suppliers did not do so;

(4)  Acquirers were to ensure that Merchants disclosed certain information prior to and after a DCC transaction.  In particular, a Merchant was required to:

a.  inform the cardholder that DCC was optional;

b.  not impose any additional requirements on the cardholder to have the transaction processed in the local currency;

c.  not use any language or procedures that may cause the cardholder to choose DCC by default; and

d.  not misrepresent, either explicitly or implicitly, that its DCC service was a Visa service.

Milner Decl. ¶ 19.

On or about April 27, 2010, Visa modified the VIOR as they related to DCC services in the Asia Pacific region and North America, by imposing among other things:

> (1) a requirement that as of May 1, 2010, all Acquirers, DCC suppliers and individual locations of a Merchant ("Merchant Outlets") wishing to offer DCC services to Visa cardholders must register in a "registration, certification and compliance program" administered by Visa (the "Visa DCC Compliance Program");
>
> (2) a requirement that North American and Asia Pacific Acquirers must re-register their existing DCC providers and Merchant Outlets; and
>
> (3) a prohibition so that only Acquirers, DCC suppliers and Merchant Outlets already actively offering DCC services as of April 30, 2010 were eligible to re-register in the Visa DCC Compliance Program (the "Prohibition").

Milner Decl. ¶¶ 20-21.

On about April 28, 2010, Visa notified members of the Visa Payment Card Network of the amendments to the VIOR and the Prohibition.  Milner Decl. ¶ 22.  The Prohibition was not lifted until on about October 21, 2010.  Milner Decl. ¶ 23.

### D.   Visa's Prohibition Thwarted Petitioners' Prospective Sale Of Their Shares In Pure Commerce

Immediately prior to the implementation of the Prohibition, Petitioners were in negotiations to sell their shares in Pure Commerce to interested third parties.  Milner Decl. ¶ 24.

In November 2009, Jefferies was engaged as Pure Commerce's financial advisor in connection with a potential sale.  Jefferies also communicated to Pure Commerce its opinion of possible valuations for the Pure Commerce business ("Jefferies Valuation"), ranging from AUD48.7 million to AUD163.1 million.  Milner Decl. ¶ 25.

As of January 2010, Jefferies had identified a list of potential purchasers that it proposed to contact, and communicated that list to Pure Commerce.  Milner Decl. ¶ 26.  By January 22, 2010, several potential purchasers had signed "possible negotiated transaction non-disclosure

agreements" and had been provided with access to confidential information such as management presentations, historical financials and financial forecasts.  Milner Decl. ¶ 27.

By March 2010, the two parties who were most advanced in the sale negotiations were Atos and Global Payments Inc. ("Global Payments").  Milner Decl. ¶ 28. Petitioners had made a presentation to senior executives of Global Payments in Atlanta on or about January 26, 2010 and to senior executives of Atos in early February 2010.  Milner Decl. ¶ 29.  Between February 9 and 11, 2010, Sidharth Singh of Global Payments and Mr. Lavecky exchanged emails about a proposed pilot program to be established between Global Payments and Pure Commerce as part of Global Payments' due diligence.  Milner Decl. ¶ 30.  Between February 2010 and April 2010, Pure Commerce, on the one hand, and Atos and Global Payments, on the other hand, exchanged correspondence regarding due diligence queries from the potential purchasers.  Milner Decl. ¶ 31.

In March 2010, in response to further due diligence questions from Global Payments, Petitioners provided Global Payments with additional information via a telephone call.  Milner Decl. ¶ 32.  In April 2010, Atos submitted additional due diligence questions, which Petitioners answered by way of a presentation to Atos in Belgium.  A final due diligence call with Atos was held on April 29, 2010.  Milner Decl. ¶ 33.

The announcement of Visa's Prohibition on or about April 28, 2010 significantly impacted the proposed sale of Pure Commerce, and the interest of Atos and Global Payments in acquiring Pure Commerce.  Milner Decl. ¶ 34.  For example, on May 1, 2010, in the course of making further arrangements with Global Payments for the proposed pilot project, Mr. Lavecky received an email from Sidharth Singh of Global Payments, in which he stated "…they are trying to kill further expansion of DCC" with the Prohibition.  Milner Decl. ¶ 34(a).

On May 4, 2010, Jefferies formally notified Atos and Global Payments of the Prohibition. In the following two weeks, Atos asked for further information relating to the Prohibition and Petitioners assisted Jefferies in preparing information about the Prohibition and the significant negative effect of the Prohibition on Pure Commerce's business.  In and following May 2010, Petitioners and Pure Commerce made further attempts to restart discussions with Atos or Global Payments, but those attempts were unsuccessful.  Milner Decl. ¶ 34(b)-(d).

It was not until January 2013 that Petitioners finally sold their shares in Pure Commerce, to epay Australia Holdings Pty Limited, a subsidiary of Euronet Worldwide, Inc.  Petitioners received cash consideration of approximately AUD29.77 million (approximately AUD19.7 million to Mr. Lavecky, approximately AUD4.8 million to Mr. Sharma and approximately AUD3.2 million to Cibalis Pty Limited, plus approximately AUD2.05 million to the sellers' advisers), and further consideration in the form of Euronet scrip, which at closing, had a value of at least AUD5 million.  The consideration received by Petitioners and Cibalis Pty Limited for the sale of their shares to Euronet was substantially less than the range of values given in the Jefferies Valuation.  Although the sale agreement included an "earn out" provision, Petitioners have not received any additional consideration under that clause to date.  Milner Decl. ¶ 35.

### E.    The Prohibition Negatively Impacted Pure Commerce's Business

Beyond derailing the sale to Atos and Global Payments, the Prohibition had a continuing impact on the operation of the Pure Commerce business, which impact lasted even after the Prohibition ceased.  The Prohibition affected DCC providers such as Pure Commerce because it demonstrated that Visa (and potentially other network suppliers) could take actions intended to prevent DCC providers from offering their services to Acquirers and Merchants.  As a result of the Prohibition, the growth of Pure Commerce slowed substantially between May 2010 and

January 2013.  Indeed, the forecast revenues and profits of the Pure Commerce business did not materially improve between April 2010 and late 2012.  Milner Decl. ¶ 36.

## III.    AUSTRALIAN    COMPETITION    AND    CONSUMER    COMMISSSION PROCEEDINGS

Between May 1, 2010 and October 2010, the Australian Competition Consumer Commission ("ACCC"), the United States Department of Justice, the Competition Commission of Singapore and the Korean Fair Trade Commission commenced regulatory inquiries and investigations into Visa concerning the imposition of the Prohibition.  Milner Decl. ¶ 37.

On February 4, 2013, the ACCC commenced proceedings in the Federal Court of Australia against Visa Worldwide, Visa Inc. and other Visa entities ("ACCC Proceedings"), alleging that the Prohibition violated the Australian Competition and Consumer Act ("ACCA").  Milner Decl. ¶ 38.

On September 3, 2015, the ACCC and the Visa entities submitted a settlement agreement whereby Visa Worldwide admitted one of the ACCC's core allegations – that Visa Worldwide's conduct was likely to have the effect of substantially lessening competition in the Visa currency conversion market and amounted to a violation of Section 47(2) of the ACCA.  Milner Decl. ¶ 39, Exh. A.  The ACCC's other claims against Visa were dismissed.  Milner Decl. Exh. B.  The Federal Court of Australia imposed a penalty of AUD18 million on Visa Worldwide.  Milner Decl. ¶ 40, Exh. B.

## IV.    PETITIONERS' AUSTRALIAN ACTION

On April 15, 2016, Petitioners commenced the Australian Action against the Visa Defendants, claiming that by imposing the Prohibition, the Visa Defendants violated the Australian Trade Practices Act, as well as the Competition Code of New South Wales and the Competition Code of Victoria.  Petitioners also claim that as a result of the Visa Defendants' conduct, Mr.

9

Lavecky and Mr. Sharma lost the opportunity in 2010 to sell their shares in Pure Commerce at the same or higher price than that which they received for the shares in 2013.  Milner Decl. ¶ 41, Exh. C.

On October 5, 2016, Petitioners made an application in the Australian Action seeking, among other things, leave to serve process on the Visa Defendants located outside of Australia, including the United States and Singapore, and a letter of request to obtain evidence in France. Petitioners also notified the Federal Court of Australia and the Visa Defendants that they would make a Section 1782 application to obtain evidence located in the United States.  Milner Decl. ¶ 53.

The Visa Defendants accepted service of the court documents in the Australian Action, which had the effect that Petitioners no longer required leave to serve process on the overseas Visa entities.  Milner Decl. ¶ 54.

On November 9, 2016, the Federal Court of Australia issued orders which had the effect of adjourning until February 8, 2017, the court's consideration of Petitioners' arguments in connection with their application for the French letter of request.  Milner Decl. ¶ 55.  Petitioners do not intend to pursue their application for a letter of request to the French courts at least until after the production of documents pursuant to Section 1782.  Milner Decl. ¶ 56.

On February 8, 2017, Petitioners' application to the Federal Court of Australia requesting permission, among other things, to seek documents from Atos pursuant to Section 1782 ("Australian Application") was set for a hearing on April 11, 2017.  On March 24, 2017, the Visa Defendants served their evidence in opposition to Petitioners' Australian Application.  Milner Decl. ¶ 57.

On April 11, 2017, the Federal Court of Australia conducted a hearing on Petitioners' Australian Application.  On May 8, 2017, the Federal Court of Australia issued an order granting Petitioners' request for permission to make an application under Section 1782 seeking documents from Atos.  Milner Decl. ¶ 58.  Specifically, the court ordered:

> The Court Approves the Applicants making applications for orders under §1782 of Title 28 of the United States Code seeking documents from Global Payments Inc, Jefferies LLC and Atos SE. in substantially the same form as those exhibited to the Affidavit of Jonathan Milner of 9 February 2017 on condition that any such proposed application be served on the Respondents at least 21 days before it is filed in the United States.

Milner Decl. ¶ 58.  In compliance with that order, Petitioners have served this application on the Visa Defendants.  Milner Decl. ¶ 59.

## V.    THE LIMITED SCOPE OF THE DOCUMENTS SOUGHT

Petitioners now bring this application pursuant to Section 1782 to obtain documents likely to be critical to prosecuting their Australian Action.  Petitioners seek permission to serve Atos with a narrowly tailored subpoena for the production of documents only.

Petitioners seek the following categories of documents from Atos: (1) any valuations or analyses created for the purpose of a potential transaction between Atos and Pure Commerce or Pure Commerce's shareholders ("Transaction"); (2) communications between Atos and Jefferies, Pure Commerce, Daniel Lavecky or Sunil Sharma related to the Transaction; (3) documents concerning whether Atos considered making an offer in relation to the Transaction; (4) documents concerning the value and structure of any offer that Atos considered making in relation to the Transaction; and (5) documents acquired in the course of, or that were created for the purpose of, the due diligence that Atos conducted of the Pure Commerce business.

These documents are directly relevant to the Australian Action because they would assist in proving that the Visa Prohibition negatively impacted the Pure Commerce business and derailed the potential sale of Petitioners' Pure Commerce shares to highly-interested parties in 2010.

Accordingly, Petitioners request that this Court enter an Order permitting Petitioners to serve a subpoena on Respondent Atos to obtain documents, a copy of which is attached to the Ta Declaration as Exhibit B.

## LEGAL ARGUMENT

Section 1782 states in pertinent part:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made pursuant to . . . the application of any interested person . . . .

28 U.S.C. § 1782(a). "Section 1782 is the production of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004). "A request for discovery under § 1782 presents two inquiries: first, whether the district court is authorized to grant the request; and second, if so, whether the district court should exercise its discretion to do so." *In re Grupo Qumma, S.A. de C.V.*, No. M 8-85, 2005 U.S. Dist. LEXIS 6898, at *2 (S.D.N.Y. Apr. 22, 2005). Courts ordinarily issue subpoenas pursuant to Section 1782 applications on an *ex parte* basis. *See*, *e.g.*, *In re Application of Esses*, 101 F.3d 873, 874 (2d Cir. 1996) (affirming grant of *ex parte* order under Section 1782).

## I.   PETITIONERS HAVE SATISFIED THE STATUTORY FACTORS UNDER SECTION 1782 FOR ISSUANCE OF THE SUBPOENA

The district court is authorized to grant a Section 1782 application when the three statutory factors are met: "(1) the person from whom discovery is sought resides (or is found) in the district …, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the

application is made by a foreign or international tribunal or any interested person." *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 81 (2d Cir. 2012). Here, the statutory factors are easily satisfied.

First, because Atos is an entity with one of its main office locations in Purchase, New York, there can be no dispute that it is "found" in this District. *See In re Kreke Immobilien KG*, No. 13 Misc. 110, 2013 U.S. Dist. LEXIS 160283, at*9 (S.D.N.Y. Nov. 8, 2013) (statutory requirements satisfied where, among other things, "the party from which discovery is being sought, is an entity operating a business within the Southern District of New York").

Second, Petitioners intend to use the documents sought in this application in the Australian Action. Thus, the documents are sought for use in a foreign proceeding. *See Lancaster Factoring Co. v. Mangone*, 90 F.3d 38, 41 (2d Cir. 1996) (requirement that discovery is for use in a foreign proceeding has been "interpreted [ ] to mean a proceeding in which an adjudicative function is being exercised").

Third, Petitioners are plaintiffs in the Australian Action and thus, there is "no doubt" that Petitioners are "included among . . . the 'interested person[s]' who may invoke § 1782." *Intel*, 542 U.S. at 26 (alterations in original).

Thus, pursuant to 28 U.S.C. § 1782, this Court has authority to grant Petitioners' application.

## II. THE DISCRETIONARY SECTION 1782 FACTORS WEIGH HEAVILY IN FAVOR OF GRANTING PETITIONERS' APPLICATION FOR ISSUANCE OF THE SUBPOENA

The Second Circuit has held that "district courts must exercise their discretion under § 1782 in light of the twin aims of the statute: 'providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts.'" *In re Metallgesellschaft AG*, 121 F.3d 77, 79

13

(2d Cir. 1997) (quoting *In re Malev Hungarian Airlines*, 964 F.2d 97, 100 (2d Cir. 1992)).  *See also In re Chevron Corp.*, 709 F. Supp. 2d 283, 290 (S.D.N.Y. 2010) (same).  "In pursuit of these twin goals, the statute has, over the years, been given increasingly broad applicability."  *Brandi-Dohrn*, 673 F.3d at 80; *see also Kulzer v. Esschem, Inc.*, 390 F. App'x 88, 92 (3d Cir. 2010) (noting "courts' consistently liberal interpretation of the statute").  Indeed, "[t]he Second Circuit has consistently ruled that it is far better to provide federal court assistance than none at all."  *Minatec Fin. S.A.R.L. v. SI Group Inc.*, No. 08-cv-269, 2008 U.S. Dist. LEXIS 63802, at *12 (N.D.N.Y. Aug. 18, 2008).

In determining whether to exercise its discretion, a court should consider the following factors set forth by the U.S. Supreme Court in *Intel*:  (1) whether the discovery sought is within the foreign tribunal's jurisdictional reach; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency to U.S. federal-court judicial assistance"; (3) whether the application is a concealed "attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the discovery requests are "unduly intrusive or burdensome."  542 U.S. at 244-45.  These factors are non-exhaustive, and no one factor is dispositive.  *See, e.g., Marubeni Am. Corp. v. LBA Y.K.*, 335 F. App'x 95, 98 (2d Cir. 2009).

Here, the discretionary factors indisputably weigh in favor of granting Petitioners' application for targeted production of documents necessary to prosecute the Australian Action.

A.    **The Evidence Petitioners Seek Is Likely Unobtainable Without This Court's Assistance**

Under the first *Intel* factor, courts should consider whether the documents sought can be obtained through the procedures of the foreign tribunal.  Under this factor, the inquiry is whether

"evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *See Intel*, 542 U.S. at 264.  This is clearly the case here.

Atos is not a party in the Australian Action, and is not subject to jurisdiction in Australia. It is not registered with the Australian Securities and Investment Commission (the Australian corporate regulator).  Milner Decl. ¶ 44.  Although the Petitioners could seek an order from the Australian court for a letter of request under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (March 18, 1970), Australian courts have held that letters of request cannot be used to obtain documents alone, and may only be used to obtain documents which are "ancillary" to the oral testimony of a witness.  *See Elna Australia Pty Ltd v International Computers Pty Ltd* (1987) 14 FCR 461.  Australian courts have also held that letters of request may not be used to obtain discovery of documents.  *See Novotny v Todd* [2002] WASCA 79 at [43].  Further, although the Federal Court of Australia may have the power (and this is far from clear) to give Petitioners leave to serve a subpoena issued by the Federal Court of Australia on a United States entity under the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (November 15, 1965), the court generally will not, subject to extremely limited exceptions, make such an order because such a subpoena would not be enforceable and may infringe comity.  *See Ceramic Fuel Cells Ltd (in liq) v McGraw-Hill Financial, Inc* (2016) 112 ACSR 102 at 49-50, 55, 67-68.  Milner Decl. ¶ 50.

Petitioners have applied to the Federal Court of Australia for a letter of request to take the oral examination of Patrick Byron, a senior Atos mergers and acquisitions executive who was involved in the negotiations in relation to the potential sale of Pure Commerce to Atos.  Following objections by the Visa Defendants, the Federal Court of Australia deferred consideration of that application.  Subsequently, Petitioners notified the Visa Defendants and the court that they did not

intend to pursue their application for the French letter of request for the time being, and instead would first attempt to obtain documents from Atos under Section 1782.  Milner Decl. ¶¶ 53-56.

Accordingly, "[t]he first factor … clearly weighs in favor of granting an order to allow [Petitioners] to collect evidence from the [Respondent Atos] located in this district."  *See In re Imanagement Servs., Ltd.*, No. Misc. 05-89, 2005 U.S. Dist. LEXIS 17025, at *10 (E.D.N.Y. Aug. 16, 2005); *see also In re Ching Chung Taoist Assoc. of H.K.*, No. 16-mc-80157-LB, 2016 U.S. Dist. LEXIS 131686, at *13 (N.D. Cal. Sep. 23, 2016) (granting Section 1782 application as to witnesses who were not parties to underlying Australian lawsuit, and who were not subject to Australian court's jurisdiction).[1]

### B.       Australian Courts Are Receptive To Assistance From U.S. Courts

Under the second discretionary factor, courts reviewing a Section 1782 application consider "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance."  *Intel*, 542 U.S. at 264.  In weighing this factor, courts typically focus on whether the foreign tribunal would be receptive to documents procured with the assistance of a U.S. court pursuant to Section 1782.  *See, e.g., In re Gemeinshcaftspraxis Dr. Med. Schottdorf*, No. Civ. M19-88, 2006 U.S. Dist. LEXIS 94161, at *19 (S.D.N.Y. Dec. 29, 2006).  "Absent specific directions to the contrary from a foreign forum, [Section 1782's] underlying policy should

---

[1]      In some cases, even if the evidence is within a foreign tribunal's jurisdictional reach, the limitations of the tribunal's own discovery rules may favor granting a Section 1782 application. In such a case, a district court may grant an applicant discovery pursuant to Section 1782 even against a person that is a party in the foreign proceeding.  *In re Servicio Pan Americano de Proteccion*, 354 F. Supp. 2d 269, 274 (S.D.N.Y. 2004). However, an applicant need not have exhausted the discovery options in the foreign country before seeking assistance in the United States.  *Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1098 (2d Cir. 1995).

generally prompt district courts to provide some form of discovery assistance." *Euromepa,* 51 F.3d at 1102.

Here, the Federal Court of Australia has issued a decision granting Petitioners' request for permission to make this Section 1782 application to obtain documents from Atos.  Milner Decl. ¶ 58 and Exh. L.  Accordingly, there is no doubt that the Federal Court of Australia is receptive to the discovery sought by Petitioners.  *See In re Futurecorp Int'l Pty Ltd.*, No. C12-80267, 2012 U.S. Dist. LEXIS 164400, at *6-7 (N.D. Cal. Nov. 15, 2012) (Court of the State of New South Wales, Australia, showed it was receptive to the discovery sought in the U.S. by granting petitioner's request for international judicial assistance).

Additionally, Australian courts are receptive to assistance from foreign courts, provided that it does not interfere with the Australian court's case management orders or the conduct of the proceedings.  While Australian courts have from time to time restrained parties from using the Section 1782 process to secure the oral examination of witnesses, that has typically been where the Australian court was not notified of the application in advance, or where the timing of the application was such that it would interfere with the orderly conduct of the Australian proceedings. Milner Decl. ¶ 52.  *See also Jones v Treasury Wine Estates Limited* (2016) 241 FCR 111 at 47-49. However, those cases also make it clear that the court may endorse such applications in some circumstances (as was done here), on the basis that it is not the Australian court's role to control the manner in which a party obtains its evidence.  Milner Decl. ¶ 52.  *See also Pathway Investments Pty Ltd v National Australia Bank Limited (No 2)* (2012) VSC 495 at 6; *Jones v Treasury Wine Estates Limited* (2016) 241 FCR 111 at 47.

17

### C.  Petitioners' Application Is Not A Bad-Faith Attempt To Circumvent Australian Proof-Gathering Restrictions

"The third discretionary factor aims to protect against abuse of § 1782 as a vehicle to end-run foreign proof-gathering restrictions or other foreign policies." *Gemeinshcaftspraxis*, 2006 U.S. Dist. LEXIS 94161, at *24.  In other words, this factor inquires into whether the requesting party is "pursuing [ ] discovery in bad faith." *Minatec*, 2008 U.S. Dist. LEXIS 63802, at *26.[2]

Here, Petitioners have already sought and obtained the Federal Court of Australia's permission to make this Section 1782 application.  Milner Decl. ¶ 58.  Petitioners have also provided notice to the Visa Defendants in the Australian Action of this Section 1782 application. Milner Decl. ¶ 59.

### D.  Petitioners' Narrow, Targeted Requests Are Not Unduly Intrusive Or Burdensome

Under the fourth discretionary factor, "unduly intrusive or burdensome requests may be rejected or trimmed." *Intel*, 542 U.S. at 265.  "The proper scope of the discovery sought under section 1782, like all federal discovery, is governed by Federal Rule 26(b)," which provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense," to the extent that it does not cause any undue burden or expense.  *In re Application Pursuant to § 1782*, 289 F.R.D. 96, 106 (S.D.N.Y. 2008).  "Whether a subpoena imposes an 'undue burden' depends on factors including relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described, and the burden imposed." *Noel v. The Bank of New York*

---

[2]    However, there is no blanket rule, for example, that the information sought under Section 1782 also be discoverable in the foreign tribunal.  *Intel*, 542 U.S. at 260-61.  Additionally, an applicant is not required to exhaust the available discovery procedures in the foreign tribunal before seeking assistance under Section 1782.  *Euromepa*, 51 F.3d at 1098.  Finally, reciprocal discovery is not required before a Section 1782 request may be granted. *Id.* at 1102.

*Mellon*, No. 11 Mc. 216, 2011 U.S. Dist. LEXIS 84106 , at *4-5 (S.D.N.Y. Jul. 27, 2011) (internal quotation marks omitted).

Here, Petitioners seek only documents from Atos, and do not currently seek any deposition testimony. Further, the proposed subpoena is narrowly tailored to request specific, relevant material, while avoiding unnecessary burden or intrusion upon Atos. *See supra* Statement of Facts, Section V.

**CONCLUSION**

For the foregoing reasons, Petitioners respectfully request that their application pursuant to 28 U.S.C. § 1782 be granted and that they be authorized to serve a subpoena for the production of documents on Atos.

DATED:     June 6, 2017
           New York, New York

HUNG G. TA, ESQ. PLLC

By:     _____
        Hung G. Ta, Esq.
        JooYun Kim, Esq.
        Natalia D. Williams, Esq.
        250 Park Avenue, 7th Floor
        New York, New York 10177
        Tel:    (646) 453-7288
        Fax:    (646) 453-7289
        Email: hta@hgtlaw.com
               jooyun@hgtlaw.com
               natalia@hgtlaw.com

        *Attorneys for Petitioners Daniel Lavecky*
        *and Sunil Sharma*